**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170395-U

Order filed March 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0395 Circuit No. 15-CF-666 |
| DERRIS KARL WALKER, | ) ) ) | Honorable Albert L. Purham Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Schmidt and Wright concurred in the judgment.

_____

**ORDER**

¶ 1       *Held*:  The evidence established that defendant knowingly caused great bodily harm to his child.

¶ 2       Defendant, Derris Karl Walker, appeals from his conviction for aggravated domestic battery. Defendant argues the State failed to prove his guilt beyond a reasonable doubt where the court's comments at the time of its finding of guilt and before sentencing indicated that it

believed that defendant did not knowingly or intentionally cause great bodily harm to the victim. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4        On August 31, 2015, A.M. was in the care of his father, defendant, when he began to have breathing problems. Defendant transported A.M. to the hospital. At the hospital, A.M. presented in full cardiac arrest, and testing showed that he had suffered a skull fracture, subdural hemorrhaging, and other significant injuries to his brain and spinal cord. On September 10, 2015, A.M. died as a result of the brain injuries.

¶ 5        On September 29, 2015, the State presented a four count indictment to the grand jury that alleged that defendant had committed two counts of first degree murder (720 ILCS 5/9-1(a)(2) (West 2014)), one count of aggravated battery (*id.* § 12-3.05(b)(1)), and aggravated domestic battery (*id.* § 12-3.3(a)). The grand jury returned a true bill of indictment on only counts three and four that charged defendant with aggravated battery and aggravated domestic battery. The two charges proceeded to a jury trial.

¶ 6        Sauntea Willis testified that, in August 2015, she had three children: C.M., who was 5 years old; T.M., who was 1 year old; and A.M., who was 10 months old. Defendant was the father of T.M. and A.M.

¶ 7        On the afternoon of August 31, 2015, Willis took a photograph and video recording of T.M. and A.M. while they sat in the backseat of her vehicle. At the time, the children were acting normally and did not appear sick. Later, defendant asked Willis to bring T.M. and A.M. to his apartment for a visit. Willis agreed and met defendant outside of his apartment. Defendant carried A.M. in his car seat into the apartment while T.M. walked beside him. When A.M. began to cry, defendant gave him a pacifier, and A.M. went back to sleep.

2

¶ 8        Around 6:30 p.m., Willis received a telephone call from defendant. Defendant asked if A.M. had asthma and said that he was breathing abnormally. Willis replied that A.M. did not have asthma and told defendant to take A.M. to the hospital.

¶ 9        Police Detective Jodie Brackney testified that she investigated the incident that led to A.M.'s injuries. At the hospital, defendant told Brackney that Willis had dropped A.M. and T.M. off at his apartment earlier in the day. Defendant arranged for T.M. to watch videos with defendant's other child while A.M. slept in his car seat on the couch. When A.M. awoke, defendant secured him in his car seat and went to check on the other children. Upon returning, defendant saw A.M. lying on the floor with the car seat on top of him. Defendant removed the car seat, placed A.M. on the couch, and handed A.M. a bottle. A.M. looked as if he was going to drink from the bottle but then started taking deep breaths. Defendant thought that A.M. might be having an asthma attack. Defendant called Willis, who said A.M. did not have asthma. Defendant took A.M. to the hospital.

¶ 10        On September 1, 2015, Brackney went to defendant's apartment to view the area where the fall had occurred. Brackney video recorded defendant as he reenacted the fall. The State introduced the video recording into evidence.

¶ 11        On the recording, defendant showed Brackney where A.M. was located on the couch. When A.M. awoke, defendant placed the car seat on the couch facing forward. Defendant propped the car seat up on a pillow so A.M. was sitting in an upright position. Defendant fastened the buckle across A.M.'s chest but left the lower buckles undone. Defendant then left the room. When he returned, the car seat was laying on top of A.M. who was lying on the ground. At that time, A.M.'s arm was caught in one of the straps of the car seat.

3

¶ 12    Pediatric intensivist Dr. Penelope Sandiford testified that on August 31, 2015, she assisted in resuscitating A.M. when he was in full cardiac arrest. Upon revival, A.M. continued to breathe abnormally. Sandiford attributed A.M.'s breathing issues to an injury to the respiratory center of the brainstem. A neurological exam also indicated injury to A.M.'s brainstem. Sandiford also noticed that A.M.'s fontanel, or soft spot, was full, which was indicative of bleeding in the skull. A.M. also had a low body temperature which was indicative of dysfunction of the hypothalamus. A CT scan showed bilateral subdural hematomas—bleeding in the layers of tissue that surrounded A.M.'s brain. Sandiford said that the hematomas could cause neurological changes but did not explain A.M.'s breathing issues. An MRI showed the subdural hematomas, as well as a small subarachnoid bleed and a bone fracture. An ophthalmologist found bleeding in A.M.'s retinae. Sandiford opined that brain bleeds and bony fractures were highly suggestive of abusive head trauma. Sandiford opined that A.M.'s injuries were inconsistent with the simple fall described by defendant. Rather, A.M.'s injuries were more likely the result of an "acceleration-deceleration" brain injury that occurs when the brain impacts the skull as the head moves back-and-forth, side-to-side, or rotationally. Sandiford said A.M.'s death was caused by the brain injury.

¶ 13    Dr. Channing Petrak testified that he was the medical director of the Pediatric Resource Center. Before A.M.'s passing, Sandiford asked Petrak for a consultation on A.M.'s case. Petrak conducted a physical examination and spoke with A.M.'s family members. Petrak observed swelling over the right part of the scalp, noted that A.M. was limp, had no cough or gag reflex, and did not respond to pain. An MRI showed a complex skull fracture on the right side of A.M.'s head. Petrak said the fracture required "more force to cause that type of fracture than it would for a simple linear fracture." In the area under the fracture, Petrak observed hemorrhaging in the

4

subgaleal, subdural, and arachnoid layers. Petrak explained that this type of bleeding resulted from the application of "significant force." Petrak also observed retinal hemorrhaging in both of A.M.'s eyes. The retinal hemorrhages were indicative of abusive head trauma and were not seen with other illnesses or accidental injuries. Petrak opined that the severity of these injuries would likely have caused A.M. to have slow gasping breaths and lose consciousness.

¶ 14    In Petrak's interview with defendant, defendant said that A.M. began breathing abnormally after he fell off the couch and his car seat landed on top of him. Initially, A.M. took a bottle from defendant, but then started breathing abnormally.

¶ 15    Petrak opined that the injuries to A.M.'s retinae and brainstem were not the result of the fall depicted in the reenactment video. Petrak opined that A.M.'s injuries were likely caused by violent shaking.

¶ 16    Forensic pathologist Dr. Scott Denton testified that he conducted a postmortem examination of A.M. Externally, A.M. appeared to be a healthy, well-nourished 10-month-old child. Denton noticed a large bruise on the right side of A.M.'s head. Denton also observed two skull fractures in the area of the bruising. Denton saw hemorrhaging in the subdural and arachnoid layers of tissue on the right side of the brain. Denton noted that the deeper parts of the midbrain contained necrotic tissue and there was bleeding in the cervical spine and spinal cord. Denton saw no indication of retinal hemorrhaging, but he explained that any retinal hemorrhages likely healed before A.M.'s death. Denton said that there was no evidence of prior injuries to A.M. that would be indicative of chronic abuse.

¶ 17    Denton watched the reenactment video and said A.M.'s injuries were inconsistent with the short fall depicted in the video. Denton explained that the fall from the couch would not account for the whiplash-type injuries to A.M.'s spinal cord and the injuries to the deeper areas

5

of the brain. Denton opined that A.M. died from cranial cerebral injuries, resulting from blunt trauma to the head.

¶ 18    Defendant testified that he had two children with Willis, T.M. and A.M. Defendant lived in an apartment with Sasha Glipse and their two children, K.W., who was two years old, and J.W., who was less than 10 months old. Defendant helped to provide clothing and food for T.M. and A.M., who lived with Willis. Defendant visited T.M. and A.M. three times per week at the home of Willis's mother or sister.

¶ 19    On August 31, 2015, defendant arranged for Willis to bring T.M. and A.M. to his apartment. Around 5 p.m., defendant met Willis outside of his apartment building. Defendant helped T.M. out of the car, and carried A.M., who was asleep in his car seat, into the apartment. Defendant placed A.M.'s car seat on the couch and walked T.M. to a room where K.W. was watching a video. Defendant started preparing bottles and food for the children when A.M. and J.W. awoke from their naps. Defendant first propped A.M. up in his car seat on the couch and then went to get J.W. Defendant also brought the older children a snack and restarted the movie that they were watching. When defendant returned to the living room, he found A.M. lying on the floor crying. Defendant panicked and lifted the car seat that had fallen on top of A.M. off. Defendant did not notice any marks, scratches, bruises or swelling on A.M. Defendant placed A.M. on the couch, and he continued to cry. Defendant thought that A.M. was hungry, so he gave A.M. a bottle. A.M. did not take a drink, and he began to breathe abnormally. Defendant thought that the fall might have "knocked the air out of him." Defendant called Willis to ask if A.M. had asthma or other breathing issues. Defendant told Willis that he was concerned about A.M.'s abnormal breathing and was going to take him to the hospital if it continued. When the phone call ended, defendant decided not to wait to see if A.M.'s breathing improved, and he took

6

A.M. to the hospital. Defendant held A.M. in his arms as he drove to the hospital. Defendant explained "I was real panicked, and it's a situation I never had to experience before, so I just didn't—just reacting to it. And I just felt like that was best—I felt like that was the best thing I should do, to carry him."

¶ 20        On the way to the hospital, A.M. continued to breathe abnormally and appeared sleepy. Defendant administer CPR to A.M. as he drove by lifting A.M. up and blowing breaths into his mouth. Defendant held A.M. in his left arm and used his right arm to "shake the top of his head." However, A.M. did not respond and continued to look like he was falling asleep. At that point, defendant "was kind of shaking the top of his head to keep him woke." Defendant met Willis at the hospital and explained what had happened. Defendant also spoke with the doctors, police officers and investigators.

¶ 21        On September 1, 2015, defendant agreed to meet with a police officer at his apartment. There, defendant reenacted the fall that preceded A.M.'s breathing issues. During the officer's visit, defendant felt nervous and "didn't really know what was going on and what—I don't know. I just felt like still kind of scared. I just wanted to fill them in what was going on and kind of nervous." Apart from receiving a traffic ticket for failing to possess automobile insurance, defendant had no prior interactions with the police. Defendant denied striking, hitting, violently shaking, or throwing A.M.

¶ 22        The defense expert, Dr. Marcus DeGraw, testified that he was employed as a pediatrician and child abuse pediatrician in Detroit, Michigan. DeGraw had reviewed A.M.'s medical records, as well as the investigation and autopsy reports. DeGraw said that A.M. suffered a skull fracture, bleeding on the outside and inside of the skull, bleeding in the spinal cord, retinal hemorrhages and brain swelling. DeGraw said "[c]learly part of that trauma consisted of blunt

7

force trauma to the side of the head—there's no doubt about that—with the skull fracture." DeGraw attributed the skull fracture, hemorrhage underneath the fracture, brain swelling, and "possibly, although unusually" the bleeding in the spinal cord to significant blunt force trauma with a rotational component. DeGraw also noted that extensive retinal hemorrhages have not been medically associated with the type of fall that A.M. suffered.

¶ 23          DeGraw both agreed and disagreed with Petrak's conclusion that a short fall did not cause A.M.'s injuries. DeGraw characterized the fall described by defendant as a complex fall because an object fell with A.M. DeGraw agreed that some of the injuries were inconsistent with that type of fall but noted that the fall could explain the majority of A.M.'s injuries. DeGraw said that shaking could "cause much of the injury we see in this case" including the retinal hemorrhages, bleeding in the brain, and spinal hematomas. However, the "shaking would need to be pretty obvious, and forceful, and significant. *** Any of us witnessing it happen would be afraid for the child's wellbeing."

¶ 24          After viewing the reenactment video, DeGraw restated that he believed that the fall shown in the video could have caused the injuries to A.M.'s head, but not the injuries to his retinae or neck. DeGraw also explained that the arc of the fall and A.M.'s location in the car seat during the fall would cause a whiplash effect, which would cause A.M.'s head to accelerate before it struck the floor. DeGraw said that moving A.M.'s head while driving a vehicle, as described by defendant and demonstrated by the state's attorney, would not be severe enough to cause the injuries.

¶ 25          Following nearly eight hours of deliberations and two requests for transcripts of witness testimony, the jury sent a note to the court stating that it was deadlocked. The court declared a mistrial.

8

¶ 26    After the mistrial, defendant waived his right to a jury trial and proceeded to a stipulated bench trial on count IV—aggravated domestic battery. The parties stipulated to the testimony from defendant's jury trial and presented arguments. The court took the matter under advisement and continued the case. The court made the following findings.

"As I was going through the transcript, I don't think that there was a lot of dispute, when I read it, as to the medical findings, so I'm not going to go into a lot of detail about the medical findings. I believe that speaks for itself. I know that Dr. Sandiford was concerned that given the nature of the injuries to the brain, the bilateral subarachnoid hemorrhages, the injuries were indicative of acceleration-deceleration. They were separate from the fractures. And I believe all the doctors distinguished what would result from the short fall. Whether or not they call it a 'short fall,' or a 'complex fall,' whatever, they distinguished certain injuries that resulted that were distinguishable from the fall from the couch that resulted in this child's death.

Dr. Channing Petrak found no medical reasons for any of [A.M.'s] injuries, and the injuries were inconsistent with the defendant's explanation. Her findings were indicative of abusive head trauma.

Dr. DeGraw, he said the injuries would require—or, actually, I think that was the question from the State—the injuries would require repetitive force beyond the fall from the couch. He did agree with that. And he also agreed that there was no medical explanation for the severity of the child's injuries.

I noted that on August 31, 2015, that [A.M.], who was born on October 23 of 2014, went to the home of his father, and he was healthy at the time that he

9

went to [defendant's] home. That he was with his—I guess his siblings. He had 3 other siblings in the home. That while [A.M.] was in the father's exclusive care, he apparently fell from the couch. While in the father's care, the child was in the baby carrier. And then it appears to this Court—and I so find that he suffered repetitive force beyond the full—fall from the couch, through the actions of his father because the child was obviously in his exclusive care. And the doctors had indicated that you would not get a whiplash effect from hitting the floor, even in the baby carrier, that would cause—that would require some repetitive force applied by the caretaker, in this case it was the father.

And therefore, as I look through all the evidence, I understood that you panicked [defendant]. But I did find you guilty of aggravated domestic battery ***."

¶ 27 Before pronouncing defendant's sentence, the court said:

"[Defendant], sitting through the trial twice actually, I never felt that you were a malicious person. I just felt you were [a] man that was overwhelmed by the situation, and after the child fell off the couch, and you heard the irregular breathing of the child and realized the child was in distress that you overreacted. Because I was always clear from all the doctors that what you described, you left something out. Okay? But I never think that you were trying to be malicious to your child. You know? And most times—most of my cases are by somebody acting maliciously with a[n] impure heart. You know? I don't think this is the result that you thought would happen after shaking this child. I thought you were

10

overwhelmed by this situation. Okay? And we're here today, and I'm trying to figure out what is the best option. You know?

* * *

*** And to be honest, as horrendous as this was, I don't think it was with a bad heart that you did this. *** I don't think that you ever thought that the child would die from the action. I really thought that you tried to revive the child, but it didn't work out that way for you.

So I will put you on 4 years of probation, the first year to be intensive."

Defendant filed a notice of appeal.

¶ 28                                    II. ANALYSIS

¶ 29      Defendant argues the State failed to prove his guilt beyond a reasonable doubt because the court's comments at the time of its finding of guilt and before sentencing indicated that it did not find that defendant acted knowingly or intentionally. Upon review of the record, we find that the evidence, viewed in the light most favorable to the prosecution, was sufficient to prove that defendant acted knowingly.

¶ 30      At the outset, we reject defendant's implicit contention that the circuit court's words control our analysis. As emphasized by our supreme court in *Collins*, we examine the sufficiency of the evidence by reviewing the evidence in the light most favorable to the prosecution and determine whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, the court's comments and express findings have little effect on our analysis as long as the evidence is sufficient to convince *any* rational trier of fact that the State proved the necessary elements of

11

the offense. This standard is also reflected in our parallel maxims that "[w]e review the trial court's judgment, not the reasons cited, and we may affirm on any basis supported by the record if the judgment is correct." *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010). Accordingly, we begin our analysis by considering the evidence of the elements of aggravated domestic battery.

¶ 31    To sustain an aggravated domestic battery conviction, the State was obligated to prove that defendant, "in committing a domestic battery, knowingly cause[d] great bodily harm" to a family member. 720 ILCS 5/12-3.3(a) (West 2014); see also *id.* § 12-3.2(a)(1).

¶ 32    Defendant solely argues that the evidence was insufficient to establish the mental state element of aggravated domestic battery—that he acted knowing his conduct would cause great bodily harm. Section 4-5 of the Criminal Code of 2012 defines the mental state of knowledge or "knowingly" as "[t]he nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist." 720 ILCS 5/4-5(a) (West 2014). Alternatively, a person acts with knowledge of "[t]he result of his or her conduct *** when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5(b). A defendant "need not intend the particular injury or consequence that resulted from his conduct." *People v. Ford*, 2015 IL App (3d) 130810, ¶ 38. The State may prove defendant's knowledge by circumstantial evidence as it is often the only way to prove a defendant's intent. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 14.

¶ 33    The evidence in this case was sufficient for " '*any* rational trier of fact' " to reasonably infer that defendant was consciously aware that his conduct was practically certain to cause bodily harm. (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at

12

319). The testimony of the State's experts and the defense expert all indicated that A.M.'s injuries were caused by more than a fall from the couch. The experts each specifically indicated that the retinae hemorrhages and injuries to A.M.'s spinal cord were likely caused by a whiplash-type acceleration-deceleration injury or severe shaking. In the words of the defense expert, DeGraw, these injuries would require the application of significant force such that a witness "would be afraid for the child's wellbeing." Willis's testimony and the photograph and video of A.M. that were taken before the visit establish that A.M. was in good health prior to his visit to defendant's apartment. Defendant indicated during his testimony that he shook A.M. to keep him alert. This evidence gave rise to the reasonable inference that the shaking referenced by defendant was or became exceptionally forceful. While defendant may have initiated the shaking with good intentions, the amount of force he eventually applied, as evidenced by A.M.'s injuries, would cause him to be consciously aware that his actions would cause great bodily harm. See *Ford*, 2015 IL App (3d) 130810, ¶ 38 (defendant need not intend the injury that resulted from his conduct). Thus, the evidence, viewed in the light most favorable to the State, proved that defendant knowingly caused great bodily harm to A.M.

¶ 34　　　　In reaching our conclusion, we reject defendant's contentions that *In re Vuk R.*, 2013 IL App (1st) 132506 and *People v. Spani*, 46 Ill. App. 3d 777 (1977), direct our conclusion. In both cases, the reviewing court focused its analysis on the lower court's comments. *Vuk R.*, 2013 IL App (1st) 132506, ¶¶ 6-7 (circuit court's comments that the witnesses for the prosecution had both testified falsely, and that the events did not occur the way the witnesses described, established that the State failed to meet its burden of proof beyond a reasonable doubt); *Spani*, 46 Ill. App. 3d at 780 (finding the circuit court's express opinion that it "didn't find Mr. Spani did anything intentionally. It was an accident ***." was incompatible with the court's finding of

guilt). This necessarily overlooks the supreme court's emphasized directive to determine whether " '*any* rational trier of fact' " could find that the evidence presented established the elements of the charged offense. *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). Moreover, unlike *Vuk R.* and *Spani*, the court's comments in this case fail to demonstrate a similar level of complete disbelief in the State's case. Therefore, we conclude the State proved defendant's guilt of aggravated domestic battery beyond a reasonable doubt.

¶ 35                                    III. CONCLUSION

¶ 36        The judgment of the circuit court of Peoria County is affirmed.

¶ 37        Affirmed.